**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) NO. 5:25-CR-00127-GFVT-MAS-7 |
| | ) |
| **CASEY ALLISON MORRIS,** | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION & ORDER**

The United States has moved to detain Defendant Casey Allison Morris in this matter, forcing the Court to confront the question of what, exactly, makes a defendant too dangerous to release pretrial? Knowing about a murder before it occurs? After it occurs? Considering loaning their car to facilitate the murder, but not actually doing so? Protecting a loved one through various illegal, obstructive acts over many months?

For the reasons that follow, the Court finds in the specific circumstances present here, there are conditions the Court can impose that will mitigate any danger Morris may pose, despite the above facts. The Court will therefore DENY the United States's motion for pretrial detention.

I.  ANALYSIS

Morris is charged with the use of interstate commerce in the commission of murder for hire, conspiracy to commit the same, and conspiracy to use a firearm in a crime of violence. [DE 87]. At the initial appearance, the United States moved for pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(A), (B), and (E) and (f)(2)(B). The Court conducted a detention hearing on November 25, 2025.

A.  **LEGAL STANDARD**

The Court afforded both sides all procedural rights outlined in the Bail Reform Act ("BRA"). The United States bears the burden to prove a defendant should be detained pretrial. Detention premised on nonappearance requires preponderant evidence. *See, e.g.*, *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, No. 6:06-CR-82-DCR, 2006 WL 2037406, at *6 (E.D. Ky. Jul. 18, 2006). Danger-based detention, however, demands clear and convincing evidence that no combination of conditions will reasonably ensure community safety. 18 U.S.C. § 3142(f). The analyses are distinct. Conditions that sufficiently target nonappearance risk may not adequately address danger potential. *See United States v. Mercedes*, 254 F.3d 433, 436-37 (2nd Cir. 2001). Further, condition effectiveness inherently hinges on a defendant's predicted good faith compliance. *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) (characterizing predicted compliance as critical release component); *United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (noting the "critical flaw" in a set of proposed release conditions: "In order to be effective, they depend on [the defendant's] good faith compliance."); *id.* at 1093 n.13

(observing that, barring a "replica detention facilit[y]," the success of any condition combination necessarily "hinge[s] on [the defendant's] good faith compliance").

Evidence rules do not apply in the detention hearing context. 18 U.S.C. § 3142(f). The key is simply evidentiary reliability and accuracy. *See, e.g.*, *United States v. Webb*, 149 F.3d 1185 (Table), No. 98-1291, 1998 WL 381686, at *1 (6th Cir. June 22, 1998). The Court properly considers a wide range of proof. The nature and quality of proof, though, impacts its probative value and weight in the detention calculus.

B. **MORRIS'S DANGER TO THE COMMUNITY**

The § 3142(g) factors drive the analysis. Specifically, the Court must consider the history and characteristics of the defendant, the nature and circumstances of the offense charged, the weight of the evidence against the person, and the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *See* 18 U.S.C. § 3142(g).

1. **Morris's History and Characteristics**

The Court must consider many aspects of Morris's background in making the decision to release or detain him. Specifically, the BRA requires courts to "take into account the available information concerning—[ . . . ] the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation[.]" 18 U.S.C. § 3142(g)(3).

Morris lives with her sister, Genna Alexander, and brother, Richmond police officer Kevin Alexander, in Lancaster, Kentucky. She has resided with them since April 2025. [Pretrial Services Report at 2]. Prior to that she lived in Florida; however, she has lived in central Kentucky for most of her life.

If released, Morris would return to her sister's residence. Her sister and/or brother-in-law offered to serve as third-party custodians. Morris is not employed, but cares for her eight-year-old child as well as her sister's children. Her sister also pays her to clean the home. [Pretrial Services Report at 2]. Morris is currently taking online classes at Somerset Community College.

Morris is 29 years old. She did not report any mental or physical ailments. [Pretrial Services Report at 4]. She reported daily use of cannabinoids, though she told USPO she last used drugs in August 2024. [Pretrial Services Report at 4]. Morris has no criminal history.

According to FBI Special Agent Isaac Robison, Morris is the girlfriend of co-defendant Desmond Bellomy. Bellomy is a member of the Hot Boyz, a criminal street gang that law enforcement believes is responsible for the murder of a federal witness.[1] Bellomy also has a separate indictment for unrelated firearm charges in this court. [*United States v. Bellomy, et al.*, 3:24-CR-00012-GFVT-MAS]. Though Morris has no criminal history, Robison described several circumstances, outlined

---

[1] The Court has previously detailed the Hot Boyz activity. [*See* DE 76]. The self-identified members of the Hot Boyz are Deangelo Boone, Daquis Sharp, Jatiece Parks, Desmond Bellomy, William Dixon, Zalan Dulin, and Chance Gist. [DE 76].

Page 4 of 15

below, in which Morris is alleged to have attempted to obstruct justice due to her criminal associates.

### a. Joshua Brown Affidavit.

Convicted murderer Joshua Brown wrote Morris a letter from prison in 2021 requesting that she sign an affidavit attempting to exculpate him in the shooting that resulted in his murder conviction. According to Robison, Morris responded indicating she was considering the request, but that she had researched the penalties for perjury and was concerned about what would happen to her child if she was imprisoned. Morris never provided the affidavit to Brown.

### b. July 27, 2023 Home Invasion and Car Theft

On July 23, 2023, Shyla Lyvers was at Morris's house when she called police to report her vehicle stolen. Lyvers is Morris's friend and a girlfriend of one of Bellomy's associates. Minutes before Lyvers reported her vehicle stolen, the vehicle was see at Mallory Court in Richmond during a home invasion where the occupants were bound and robbed by three masked men suspected to be Desmond Bellomy, William Dixon[2] (another co-defendant in this case), and Stephan Fisher (an associate of Bellomy and Dixon). When police responded to Morris's house regarding Lyver's stolen vehicle, Morris said she had seen the vehicle parked on the street near her home. But when Morris was confronted with video evidence that the vehicle had

---

[2] The United States introduced evidence at the detention hearing about William Dixon, the codefendant in this case, and Machem Dixon, another associate of Morris and Bellomy. The former is referred to herein as "Dixon" while the latter is referred to as "Machem."

never been parked on her street, Morris changed her story to the police, twice. Certainly, the United States implied Lyvers knew her vehicle was being used to commit a crime and reported it stolen to exculpate herself, and that Morris attempted to back up Lyvers's story to law enforcement. It is also possible Morris was mistaken, as she claimed, because she never actually viewed Lyvers's vehicle when Lyvers arrived that day.

### c. Leaked Law Enforcement Information

Robison testified there are concerns about Morris attempting to take advantage of her brother-in-law's position as a Richmond police officer. For example, Morris asked her sister if she or her husband knew anything about the Mallory Court robbery. According to Robison, text messages between Morris and her sister demonstrated that Morris's sister provided Morris the identities of the Mallory Court robbery victims, who were, incidentally, Morris's former next-door neighbors. Robison further testified about text messages recovered from Morris's cell phone where she told another friend that upon moving in with the Alexanders, she would attempt to get closer to her brother-in-law to gain an advantage.

### d. Jail Contacts

Morris was captured on jail video calls discussing with Bellomy that she had been passing messages between Machem Dixon and Stephan Fisher while they were both incarcerated pretrial as codefendants in a state case. At one point Morris tells Bellomy that Machem Dixon wanted her to "tell Stevie what he needed to go and do in Court." [Government Ex. 12]. Robison testified law enforcement confirmed that

Morris was, in fact, passing messages between the two men using recording jail communications.

### e. *Affidavit for Bellomy's 18 U.S.C. § 922(g)(1) Case*

Robison testified Morris attempted to claim ownership of firearms found in a vehicle Bellomy was driving on November 7, 2023. Bellomy is a convicted felon and therefore prohibited from possessing firearms. Morris, however, is not. Robison described the specific and unique features of the firearms: a Glock 17 with a drum magazine and a Glock 23 with a red binary trigger. Law enforcement recovered text messages between Morris and Dixon on November 8, 2023, in which Morris says "he needs to say he had no idea it was in the car[,]" presumably talking about Bellomy's arrest the day before. [Government's Ex. 7]. Later in the conversation, Morris says she "got [her] rap together" and that although Morris "n him may have fell out" she will "always have love for him, care about him and help him any way [she] can[.]" [Government's Ex. 8]. According to Robison, this was again about Bellomy's arrest the day before. Law enforcement then recovered a photograph of an affidavit on Dixon's phone, signed by Morris before a notary public on November 8, 2023, stating that the two firearms in the vehicle were hers.

On February 27, 2024, Morris messaged Dixon on Facebook complaining that "Desmond" had not returned her car, and threatening that if he did not she would not help "with the court situation." [Government Ex. 11].

Law enforcement conducted an interview of Morris on May 21, 2024, regarding the firearms she claimed to be hers. The United States introduced body worn camera

footage of this interview. [Government's Ex. 10]. Morris told the officers the firearms were hers. However, she was unable to describe what kinds of firearms they were and said she did not recognize at least one of the photographs. Further, she told Morris that she had gotten a ride from a friend to Enterprise Rental Car in the vehicle where the firearms were found and had chosen to leave the firearms in the vehicle rather than take them inside the rental car facility. The United States proffered that upon checking Enterprise's records as well as the records for the subject vehicle, Morris rented the car days before her friend acquired the subject vehicle, making her story impossible.

Bellomy was eventually indicted in this court for a violation of 18 U.S.C. § 922(g)(1), being a felon in possession of a firearm. There is no evidence Morris's November 8, 2023, affidavit was ever tendered to any state or federal authority, though her police interview on May 21, 2023, certainly appears to be an attempt to obstruct justice. Morris was recorded on a jail phone call after her police interview telling Bellomy that the police had visited her. According to Robison, Bellomy told Morris in coded terms to destroy her phone; however, Morris did not destroy it and the phone was later seized and searched by law enforcement.

Morris has no criminal history, a stable living environment, family support, and no history of violence or substance use. However, the United States set forth numerous alleged instances of Morris attempting to obstruct or interfere with criminal proceedings, many of which related to her codefendants in this case. The evidence of obstruction was in some cases obvious and overt (such as her May 2024

interview with law enforcement) and in other instances questionable at best (such as the testimony about her consideration of providing Joshua Brown an affidavit that never materialized). All in all, the Court finds that Morris's history, though pockmarked with potential obstructionist acts, is sufficiently devoid of any criminal or violent activity to warrant release.

C.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE CHARGED

The BRA requires Courts to consider the "nature and circumstances of the offense charged, including whether the offense is a crime of violence[.]" 18 U.S.C. § 3142(g)(1). Robison testified about the nature and circumstances of Morris's role in this case. His testimony is summarized below.

Law enforcement believes Morris's codefendants Parks, Bellomy, Sharp, and Dixon were hired by codefendant Lamar to murder Kristopher Lewis so that Lewis could not testify at Lamar's trial in case number 5:22-CR-50-GFVT-MAS. Lewis was shot and killed outside his workplace on September 29, 2023.

Robison discussed text messages between Morris and Bellomy on September 27, 28, and 29, 2023, as well as messages between Bellomy and Dixon on September 27, 2023, and between Morris and Lyvers on September 30, 2023. [Government's exhibits 1-6]. On the evening of September 27, 2023, Dixon texted Bellomy that they were "bou go get dat mu'fucka" and asking him "[i]s it a go." [Government Ex. 1]. Bellomy responded "ya bet" and that "she good wit it." [Government Ex. 1]. Robison testified law enforcement believes "she" is Morris. The men then discuss obtaining a "dirty" license plate. Minutes prior to these texts between Bellomy and Dixon, Morris's phone had received a text that said, "hey quick serious question[.]" Minutes

Page **9** of **15**

after the texts between Bellomy and Dixon, Morris's phone received a text that said that the sender did not want "it" to be something she was doing for the sender and that "it" would be for "both" of them. Morris deleted these texts from her phone; therefore it is unclear who sent them. Robison testified he believed it was Bellomy.

The United States introduced text messages between Bellomy and Morris on September 28, 2023. Morris had deleted these messages, but had also screen captured them, which was how law enforcement ultimately obtained them. The messages reflect Morris asking for her car back from Bellomy. The conversation makes clear that Bellomy had Morris's car the entire evening and night of September 27th and still possessed it throughout the day of September 28th. Morris repeatedly requested he return her vehicle. At one point, Bellomy refuses to return her car, telling her that he was not on the way to her house, he was instead "goin back to sit in this house for rn[.]" Morris asks why and he responds, "gotta learn his schedule need this money[.]" [Government Ex. 4].

Robison testified that the vehicle connected to the Lewis murder was not Morris's vehicle. He stated based on review of her text messages, it appears Morris revoked her consent for Bellomy to use her car on September 28, 2023, and did not allow him to use it the following day. Law enforcement recovered text messages from Morris's phone that Morris sent on September 30, 2023, stating, "I wish I wouldn't have said nun low key I wish I woulda gave em my car n let em come back n them me just take him back home and leave him on silent." [Government's Ex. 6]. Robison stated law enforcement believe Morris was expressing regret to a friend that she did

not allow Bellomy to use her vehicle for the Lewis murder. While this is one possible interpretation of the text, the context of the message is far from clear.

The alleged crime of this conspiracy is, essentially, obstruction of justice by *murder*. The Court cannot fathom a greater danger to another person, the community, or the judicial process. The nature of the crime is danger to the maximum degree. However, Morris's role in this conspiracy, if any, is exceedingly minor. The text messages imply that she may have known of the murder plot before it occurred. The text messages imply she may have regretted not allowing her car to be used as the getaway car. And there is strong evidence that she was attempting to hide *something* when she deleted text messages between herself and Dixon and Bellomy around the time of the murder. The Court considers all of these facts in calculating Morris's overall dangerousness; however, the nature of this crime still weighs in favor of detention.

D. **THE WEIGHT OF THE EVIDENCE OF DANGEROUSNESS**

This BRA factor is somewhat duplicative of the first and third because, in considering a defendant's overall dangerousness, the Court must consider the facts of the crime alleged as well as evidence that the defendant has been dangerous in the past, such as criminal history and a history of violent or obstructive behavior.

The United States heavily stressed the several instances of alleged obstruction Morris has engaged in since 2021. Obstruction of justice is a specific subcategory of the risk of danger the BRA addresses. The risk of obstruction is serious in this matter, considering both the charges that relate to obstructing a court proceeding by

killing a witness, as well as Morris's personal history of apparently attempting to interfere with criminal investigations.

The overall weight of Morris's danger to the community, though, is light because of her lack of criminal charges (much less convictions), violent behavior, drug use or drug trafficking. Much of the United States's evidence is premised up educated guesses as to who sent what text and what it might have meant—while these guesses make sense, there are plenty of alternative and innocent explanations for those texts as well. Even taking the government's evidence in the light most negative to Morris, there is no evidence she has personally ever participated in any violent acts. The primary participation she is alleged to have had in this case is considering to loan her car for the murder but later revoking that permission.

The Court finds that these facts mandate the conclusion that the weight of Morris's danger to the community is light.

E.   **THE NATURE AND SERIOUSNESS OF DANGER POSED BY RELEASE**

The Court must weigh "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). As discussed above, the United States presented evidence that Morris has obstructed, attempted to obstruct, or considered obstructing legal proceedings in the past.

The United States argued that the nature of the danger to the community is serious, if not life-threatening, particularly to any witnesses involved in this case, and that Morris poses a threat to the integrity of the judicial process. In a District Court case from Puerto Rico that the undersigned has already cited in a codefendant's

detention decision, the Court there found that "[t]he risk of danger to the community as to [the defendant] is clearly supported by his own conduct demonstrating violence by *critically aiding* in the Murder–For–Hire . . . ." *United States v. Ferrer-Sosa*, 28 F. Supp. 3d 122, 130 (D.P.R. 2014) (emphasis added). See DE **, Order of Detention for codefendant Deangalo Boone. The Court can easily distinguish the Puerto Rico case, or Boone's case, from Morris's. Based on the information presented at the detention hearing, Morris did not critically aid in the murder of Lewis. In fact, Morris demanded Bellomy return her car on September 28, 2023, which, according to the United States's proffer, caused the Hot Boyz to be angry with Morris for the inconvenience of not being able to use her vehicle on the date of the murder. Further, the evidence was inconclusive as to whether, or how much, Morris knew about the murder plot, both before and after it occurred.

Morris's history nonetheless raises serious concerns that she may attempt to interfere with the judicial process in this case. The United States proffered that Morris continues to have contact with known associates of the Hot Boyz, as well as her codefendants. The question presented, then, is whether the Court can craft conditions to adequately mitigate the risk that Morris interferes with the progression of this case. The Court believes it can.

First, the Court considers Morris's living situation. Morris resides with her child, her sister, her police officer brother-in-law, and their children. Morris cares for her child and assists in the care of her sister's children and home. Morris has little reason to leave the home; and considering the risks of obstruction presented, home

incarceration is appropriate. Home incarceration will be advanced by location monitoring as directed by USPO.

Second, the Court considers Kelvin Alexander's offer to be Morris's third-party custodian. At the detention hearing, the Court placed Alexander under oath and questioned him about his willingness and fitness to be a third-party custodian, responsible for supervising Morris and reporting all violations to USPO. The Court was satisfied that Alexander will be an acceptable custodian, particularly due to his position as a law enforcement officer. The Court wholly expects that a law enforcement officer will take this duty seriously and with the utmost respect for the Court. Recognizing that Alexander has firearms in the home as part of his uniform, the Court will require Alexander to maintain all firearms in a locked gun safe, and that Morris have no access to the safe.

Finally, Morris must have no contact whatsoever with any codefendants in this case. The protective order already in place requires that Morris be supervised any time she is reviewing the discovery in this matter. Any violation of this condition will almost certainly result in bond revocation.

### F.   NONAPPEARANCE

The United States did not address whether Morris is a risk of nonappearance, and, thus, did not carry its burden to prove by a preponderance of the evidence that she poses a risk of not appearing for future court dates.

## II.   CONCLUSION

Having no criminal record, history of violence, or any other worrisome factors, the Court is solely concerned with the risk that Morris may attempt to obstruct justice

in this case. With the above conditions in place, the Court can adequately mitigate that risk.

On balance, even with the heinous allegations in this case, the Court finds that Morris's alleged minor role and lack of criminal history require pretrial release under the BRA. The United States did not show by clear and convincing evidence that Morris is an unmitigable danger to the community or others. As to the risk of nonappearance, the United States did not demonstrate by a preponderance of the evidence that Morris is unlikely to appear as required.

Accordingly, **IT IS ORDERED** that the United States' oral motion for detention is **DENIED** and directs that Morris be released pursuant to the Order Setting Conditions of Release at DE 148.

The parties may appeal this Order under the terms of 18 U.S.C. § 3145(a).

Signed this the 30th of November, 2025.



MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY